JANE DOE NO. 60,

      Plaintiff,

v.

G-STAR SCHOOL OF THE ARTS, INC.,

      Defendant.

_____/

## <u>ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

**THIS CAUSE** is before the Court upon Defendant G-Star School of the Arts, Inc.'s ("Defendant" or "G-Star School") Motion for Summary Judgment, ECF No. [52] (the "Motion"). The Court has reviewed the Motion, all opposing and supporting submissions, the record and the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is denied.

## I.    BACKGROUND

This action is brought by minor Plaintiff Jane Doe No. 60 ("Plaintiff") and arises out of the alleged sexual harassment and assault of Plaintiff by one of her high school teachers at G-Star School, a not-for-profit charter school. Plaintiff attended G-Star School from August 2011, when she began the tenth grade, through June 2014, when she graduated. Defendant's Statement of Undisputed Facts, ECF No. [52] ("Def. SOF") at ¶¶ 2, 30.[1] According to Plaintiff, throughout her tenth grade year, her history teacher, Ismael Martinez ("Martinez), "groomed" her to gain her trust and develop an inappropriate relationship with her. *See* ECF No. [75] at ¶ 9. This process

---

[1] Where a fact is uncontroverted by the opposing party, the Court cites only to the originating Statement of Facts.

began at the beginning of the school year when Martinez stated to her that she was beautiful and assigned her to sit in the front of his class. Plaintiff's Additional Material Facts, ECF No. [58] at 3-10 ("Pl. Additional Facts"), ¶ 1.[2] On another other occasion, Martinez allegedly sang the lyrics of a sexually explicit song to Plaintiff and asked her what she likes to do sexually. *Id.* at ¶ 3.

Plaintiff further alleges that some time afterwards, on April 17, 2012, Martinez had her attend a tutoring session in his classroom after school. *Id.* at ¶ 6. Allegedly, while Martinez and Plaintiff were alone in his classroom, Martinez again asked Plaintiff what she likes to do sexually, stated to Plaintiff that he "like[s] to eat pussy[,]" and then, at the end of the tutoring session when Plaintiff was getting ready to leave, sexually assaulted Plaintiff. *Id.* Specifically, Plaintiff alleges that Martinez came up to her from behind as she was packing her book bag, caressed her thighs and buttocks, and began kissing her neck. *Id.* Martinez then placed Plaintiff on her desk, felt her breasts, pulled down her blouse and bra, kissed her on the breasts while whispering "I want you so bad[,]" and placed her hand on his penis. *Id.* Martinez also tried to remove Plaintiff's pants, but Plaintiff stopped him. *Id.* According to Plaintiff, she began to believe that she was in love with Martinez after the alleged sexual encounter, and the inappropriate relationship between them continued throughout her eleventh and twelfth grade years. *Id.* at ¶ 7; ECF No. [75] at ¶¶ 12-14.

Throughout the course of this litigation and since first being confronted with reports of the alleged relationship between him and Plaintiff, Martinez has denied what Plaintiff now alleges, maintaining that he has never been involved in an inappropriate relationship with Plaintiff. The first of those reports stemmed from Plaintiff herself, though indirectly. Shortly after the alleged sexual encounter on April 17, 2012, Plaintiff disclosed to a fellow classmate,

---

[2] Plaintiff's Statement of Material Facts, ECF No. [58] ("Pl. SOF"), also provides 31 "Additional Material Facts," *see id.* at 3-10. Defendant does not address these facts individually, but does generally address their subject matter in its Reply. *See* ECF No. [63].

Nina Nordarse ("Nordarse"), that she was in a relationship with Martinez. Def. SOF at ¶ 5; Pl. SOF at ¶ 5. Thereafter, Nordarse spoke with a G-Star School employee, Travis Hagler ("Hagler"), informing him that a girl in one of her classes had hinted to her that she was in a relationship with Martinez. Def. SOF at ¶ 7. Hagler then immediately advised the founder and CEO of G-Star School, Gregory Hauptner ("Hauptner"), of the information he received during his conversation with Nordarse. *Id.* at ¶¶ 9-10.

On Friday, April 20, 2012, Hauptner and the principal of G-Star School, Kimberly Collins ("Principal Collins"), spoke with Plaintiff in their office. *Id.* at ¶ 11. At that meeting, Plaintiff denied that she was inappropriately involved with any teacher of G-Star School and stated that some girls in the school were spreading untrue rumors about her, including that one. *Id.* at ¶ 12. Plaintiff's statements at the meeting were memorialized in a typed statement, which Plaintiff then reviewed and signed. *Id.* at ¶ 13; *see also* ECF No. [52-1] at Exh. E.

The next day, Martinez contacted Hauptner and Principal Collins to inform them that a student named Nicole Elkins ("Elkins") had told him of a rumor going around that "he hooked with a student," which he denied to Hauptner and Principal Collins. Def. SOF at ¶¶ 14-15. Hauptner made a written note of this conversation, and indicated on the note his intention to find out how Plaintiff commuted home from school, whether she ever stays at school after hours, and what day the rumored incident could have taken place. *Id.* at ¶¶ 15-16.

The following Monday, on April 23, 2012, Plaintiff was again called into Hauptner and Principal Collins' office, this time due to a rumor that Plaintiff was going to shoot someone. *Id.* at ¶ 17. At that meeting, Plaintiff explained that she had only joked with her friends about shooting someone. *Id.* at ¶ 18. Hauptner and Principal Collins documented this meeting in a typed note. *id.* at ¶ 19. The note indicates that the two of them spoke with Plaintiff's parents

over the phone later that same day regarding both the shooting-related rumor and the meeting with Plaintiff, *see* ECF No. [52-1] at Exh. H. According to the note, Hauptner and Principal Collins also informed Plaintiff's parents during their conversation that they "had been hearing rumors concerning their daughter and had asked her about any inappropriate activity between her, any teacher, any staff member or students[,]" and also requested that Plaintiff's parents "call [] immediately" if they learned any more information about the rumors from Plaintiff. ECF No. [52-1] at Exh. H. During the conversation, Plaintiff's father informed Hauptner that Plaintiff had been arriving home from school at the usual time every day except for the previous Tuesday or Wednesday (April 17th or April 18th) because she had to make up a test. Def. SOF at ¶ 22 (citing ECF No. [52-1] at Exh. H).

Thereafter, Martinez, at the instruction of Hauptner and Principal Collins, prepared a document outlining his schedule during the week of April 16, 2012—identifying in particular any students who were in his classroom either during the lunch hour or after school that week— which reflected that Plaintiff stayed after school to complete make-up homework on April 17, 2012. *Id.* at ¶¶ 24-25. Hauptner and Principal Collins then had the rest of the teachers with classrooms in the same building as Martinez indicate whether they also had students stay after school on April 17, 2012 and provide what time each of them left the school that day. *Id.* at ¶¶ 26-27. Upon collecting the above information, Hauptner and Principal Collins concluded in a final report that there was a "complete lack of any evidence that the rumor is true that [Plaintiff] and the teacher had any inappropriate contact[,]" noting that both Plaintiff and Martinez "completely denied" the rumor. *Id.* at ¶ 28 (citing ECF No. [52-1] at Exh. K). Thus, as reflected in the final report, Hauptner and Principal Collins concluded that "[t]here was no inappropriate contact between the teacher and [Plaintiff]" and deemed "[t]he matter concerning the teacher []

dropped." ECF No. [52-1] at Exh. K. Apparently, no further action was taken by G-Star School with respect to Plaintiff and Martinez.

After graduating from G-Star School in 2014, Plaintiff filed the instant action against G-Star School on March 21, 2016. In an Amended Complaint filed on April 25, 2016, ECF No. [6], Plaintiff asserted a claim for negligence (Count I) and a claim for violations of Title IX, 20 U.S.C. § 1681 *et seq.* (Count II).[3] On September 6, 2016, the Court granted a Motion for Judgment on the Pleadings filed by G-Star School, dismissing Plaintiff's negligence claim without prejudice for Plaintiff's failure to allege that G-Star School was provided with pre-suit notice as required under Fla. Stat. § 768.28(6). ECF No. [35]. The Court advised that Plaintiff would be allowed to refile the negligence claim after complying with the pre-suit notice requirements of Fla. Stat. § 768.28(6). *Id.* at 15. On April 14, 2017, the Court, satisfied that Plaintiff had thereafter complied with the pre-suit notice requirements of Fla. Stat. § 768.28(6), granted Plaintiff leave to file a Second Amended Complaint reasserting the negligence claim against Defendant, which Plaintiff filed on April 19, 2017. *See* ECF Nos. [72], [74]. Prior to the filing of Plaintiff's Second Amended Complaint, on March 3, 2017, G-Star School filed its Motion for Summary Judgment with respect to Plaintiff's Title IX claim—the only claim asserted at the time. ECF No. [52]. Plaintiff's Response, ECF No. [57], and G-Star School's Reply, ECF No. [63], timely followed.[4]

## II. LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[3] Plaintiff also filed a complaint with the Palm Springs Police Department against Martinez after she graduated. Def. SOF at ¶ 30.

[4] G-Star School has since filed a Motion to Dismiss Count I of Plaintiff's Second Amended Complaint, ECF No. [78], seeking dismissal of Plaintiff's negligence claim with prejudice. The Court will address G-Star School's Motion to Dismiss by separate order.

law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories,

and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. But even where an opposing party neglects to submit any alleged material facts in controversy, a court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed. *See Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

In resolving the issues presented under Fed. R. Civ. P. 56, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993)). Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

In particular, summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston*, 9 F.3d at 919; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); *Gary v. Modena*, 2006 WL 3741364, at \*16 (11th Cir. Dec. 21, 2006) (Fed. R. Civ. P. 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez v. Nicholas*, 2013 WL 5596114, at \*4 (S.D. Fla. Oct.11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

## III.    DISCUSSION

The essence of Plaintiff's claim under Title IX is that the alleged sexual assault of Plaintiff and the alleged inappropriate relationship that formed between her and Martinez subject G-Star School to civil liability for sexual harassment. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The Supreme Court has recognized an implied right of action for money damages under Title IX in cases of intentional sexual discrimination, including a teacher's sexual harassment of a student. *Franklin v. Gwinnett Cnty. Pub. Schools*, 503 U.S. 60, 75-76 (1992); *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) ("[S]exual harassment' is 'discrimination' in the school context under Title IX.").

A school district's Title IX liability for teacher-on-student harassment is governed by the Supreme Court's decision in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998). However, damages are only recoverable under Title IX for teacher-on-student harassment if a school official with authority to address the alleged discrimination and to institute corrective measures has actual knowledge of and is deliberately indifferent to the

discrimination. *Id.* at 290; *see also Davis*, 526 U.S. at 641 (affirming that a recipient of federal education funds may be liable under Title IX where it is deliberately indifferent to known acts of sexual harassment). "Therefore, applying the *Gebser* framework to the summary judgment context requires three related inquiries." *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1254 (11th Cir. 2010).

> First, the plaintiff must be able to identify an "appropriate person" under Title IX, i.e., a school district official with the authority to take corrective measures in response to actual notice of sexual harassment. Second, the substance of that actual notice must be sufficient to alert the school official of the possibility of the Title IX plaintiff's harassment. And finally, the official with such notice must exhibit deliberate indifference to the harassment.

*Id.* (internal citations omitted). Deliberate indifference "is an official decision by the recipient not to remedy the violation[,]" *Gebser*, 524 U.S. at 290, which requires a showing that a school district's actions are "clearly unreasonable in light of the circumstances[,]" *Davis*, 526 U.S. at 648.

Here, the parties do not dispute that G-Star School qualifies as a recipient of federal education funding for Title IX purposes, nor is there any argument that Hauptner and Principal Collins are not school officials with the authority to address the alleged discrimination and to institute corrective measures on the Title IX recipient's behalf. Rather, G-Star School argues in its Motion that Plaintiff's Title IX claim fails as a matter of law for two reasons: (1) the record does not demonstrate that G-Star School received actual notice that Plaintiff and Martinez were involved in an inappropriate relationship; and (2) the record fails to demonstrate that G-Star School's response to the rumor brought to its attention by Hagler on April 20, 2012 constituted deliberate indifference. ECF No. [52] at 12. The Court will address each argument in turn.

## A. Actual Notice

G-Star School's argument that it did not receive actual notice that Plaintiff was subjected to sexual harassment by Martinez is straightforward: Plaintiff, during her initial meeting with Hauptner and Principal Collins on April 20, 2012, "adamantly denied the rumor" that she and Martinez were involved in an inappropriate relationship, and in doing so, "decided to not give the school actual notice of any sexual harassment by Martinez." *Id.* at 13-14. G-Star School emphasizes that "there were no third-party witnesses to any inappropriate conduct" and that "Plaintiff would be the only person, other than Martinez, with firsthand knowledge of Martinez's alleged misconduct towards her." *Id.* at 13. Plaintiff, on the other hand, avers that there is evidence in the record showing that, before the alleged sexual encounter on April 17, 2012, she advised the Assistant Principal for Discipline of G-Star School, Anthony Andrepont ("Andrepont"), that Martinez had made inappropriate sexual communications to her, and Andrepont immediately reported that information to Principal Collins. ECF No. [57] at 3-4, 11-12. Plaintiff argues that Andrepont's report, in addition to the "multiple reports" of an inappropriate relationship between Plaintiff and Martinez following the alleged sexual encounter—namely, the rumors brought to Hauptner and Principal Collins' attention—sufficiently notified G-Star School that Martinez posed a substantial risk of sexual harassment. *See id.* at 10-14.

As reflected above, the parties are at odds with respect to the operative theory of actual notice underpinning Plaintiff's Title IX claim. More specifically, Plaintiff's argument in favor of actual notice places significant focus on an occurrence that G-Star School's argument against actual notice does not even acknowledge—that is, Plaintiff's report to Andrepont of inappropriate comments made to her by Martinez *prior* to the alleged sexual encounter on April

17, 2012 and Andrepont's subsequent relay of that report to Hauptner and Principal Collins. G-Star School suggests in its Reply that Plaintiff's reliance on this alleged occurrence constitutes an improper attempt to amend the Second Amended Complaint by way of argument in order to create an issue of material fact concerning G-Star School's actual notice of any misconduct by Martinez *prior* to the alleged sexual encounter on April 17, 2012. *See* ECF No. [63] at 2-3, 5. G-Star School asserts as follows: "Plaintiff has never alleged in any pleading that she informed Andrepont or any administrator about communications that she had with Martinez, and she has never alleged that Andrepont subsequently reported that information to Hauptner and Collins. More importantly, Plaintiff has never moved to amend her Complaint to reflect these allegations . . . ." *Id.* at 5. As such, G-Star School contends that based on the four corners of the Second Amended Complaint, the only issue to be addressed with respect to actual notice in this case is whether G-Star School received actual notice of the alleged sexual encounter on April 17, 2012; according to G-Star School, no other theory of notice may be relied upon by Plaintiff at this point. *See id.* at 3. The Court disagrees.

To begin with, it is important to recognize the scope of what can constitute sufficient actual notice for purposes of Title IX in the context of teacher-on-student harassment. As the Eleventh Circuit has explained, "lesser harassment may still provide actual notice of sexually violent conduct, for it is the *risk* of such conduct that the Title IX recipient has the duty to deter." *Sch. Bd. of Broward Cty.*, 604 F.3d at 1258 (citation omitted) (emphasis added). "Even if prior complaints by other students are not clearly credible, at some point 'a supervisory school official knows . . . that a school employee is a substantial *risk* to sexually abuse children.'" *Id.* at 1259 (quoting *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006)) (emphasis added); *see also Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp. 2d 679, 688 (W.D. Ky. 2003) ("[T]he

Court thus finds that the actual notice standard is met when an appropriate official has actual knowledge of a substantial risk of abuse to students based on prior complaints by other students."). Accordingly, setting aside for a moment what Plaintiff's Second Amended Complaint does or does not allege, the Court recognizes that at a general level, Plaintiff would by no means be limited to proving G-Star School's actual notice of the alleged sexual encounter on April 17, 2012—and only such actual notice—in order to prevail on her Title IX claim. Rather, a Title IX claim such as Plaintiff's may prove sufficient where it can be shown that the appropriate school official has actual knowledge that a particular school employee presents a substantial risk to abuse students.

It is within this purview that the Court addresses G-Star School's argument that the Second Amended Complaint does not allow for what it characterizes as a newly raised theory of actual notice. G-Star School is correct in pointing out that Plaintiff does allege that G-Star School had actual notice of the alleged sexual encounter on April 17, 2012. *See* ECF No. [75] at ¶ 24. However, a careful review of the Second Amended Complaint reveals that that allegation of actual notice is not necessarily to the exclusion of any other actual notice on the part of G-Star School, such as actual notice that Martinez posed a substantial risk of abuse to students prior to the alleged sexual encounter on April 17, 2012. Indeed, the Second Amended Complaint specifically alleges that Martinez took advantage of G-Star School's "sexually charged and permissive environment" by "grooming" one other female student, and, more importantly, that "it was foreseeable that male teachers, including . . . Martinez, would sexually groom and sexually harass or molest female students." *Id.* at ¶¶ 18-20. Perhaps even more relevant, the Second Amended Complaint also alleges that "at all relevant times there were 'red flags' known at the School by administration regarding Martinez's sexual proclivities with female students[,] .

. . includ[ing] Martinez's acts and conduct of excessive and inappropriate flirting and sexual harassment of female students." *Id.* at ¶ 23. As an example, the Second Amended Complaint alleges that Martinez "made sexually inappropriate comments to female students . . . ." *Id.* In light of these allegations, the Court cannot conclude that the four corners of the Second Amended Complaint preclude the particular theory of actual notice asserted by Plaintiff, which stems in part from an allegation that, prior to the alleged sexual encounter on April 17, 2012, Martinez made inappropriate sexual communications to Plaintiff and Plaintiff reported those communications to a G-Star School official, who in turn reported those communications to Hauptner and Principal Collins.

Ultimately, Plaintiff's theory of actual notice places at the forefront a genuine dispute between the parties, as G-Star School not only presents evidence directly challenging that theory, but also challenges the evidence Plaintiff has presented in support of it—which includes deposition testimony from Plaintiff and Andrepont, as well as a declaration signed by Andrepont. *See* ECF Nos. [58-1], [58-2], [58-13]; *see also* ECF Nos. [52-1] at Exhs. F, M-O. According to Andrepont's November 15, 2016 deposition testimony, Plaintiff approached him one day during the school lunch hour and informed him that Martinez had asked her questions and made comments to her that made her feel uncomfortable, which Andrepont promptly reported to Principal Collins. ECF No. [58-2] at 12-13. That account was consistent with Plaintiff's testimony at her second deposition on November 18, 2016, which added that Plaintiff specifically told Andrepont that Martinez had sung a song to her with sexually charged lyrics. *See* ECF No. [58-1] at 79-82. As G-Star School points out, however, both Hauptner and Principal Collins deny that Andrepont ever approached them about Plaintiff and Martinez. *See* Def. SOF at ¶ 42; ECF No. [52-1] at Exh. A at 107-08; ECF No. [52-1] at Exh. B at 63. G-Star

School seemingly attempts to attack the plausibility of Andrepont's and Plaintiff's accounts by claiming that they rely on Andrepont's "sham declaration"[5] and emphasizing that Plaintiff initially testified at her first deposition on September 8, 2016 that she never told anyone that Martinez made inappropriate comments to her. ECF No. [63] at 5; *see also* Def. SOF at ¶ 31. Problematically, however, these attempts clearly call for credibility determinations and the weighing of competing evidence, both of which are improper for the Court to engage in when adjudicating a motion for summary judgment. *See Strickland*, 692 F.3d at 1154; *Hairston*, 9 F.3d at 919; *Mize*, 93 F.3d at 742.

Instead, "[w]here the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence. . . . [T]he non-movant's evidence is to be accepted for purposes of summary judgment." *Mize*, 93 F.3d at 742. Here, if Plaintiff is able to prove her and Andrepont's assertions that Hauptner and Principal Collins were aware of a report that Martinez had engaged in sexually harassing behavior toward Plaintiff prior to the alleged sexual encounter on April 17, 2012 and the related rumors that ensued, a reasonable jury could find that Hauptner and Principal Collins knew that Martinez posed a substantial risk of sexual abuse to the students of G-Star School. Viewed in totality, Hauptner and Principal Collins would have been alerted to—on three separate occasions and from at least three separate sources—the possibility of inappropriate behavior of a sexual nature by Martinez directed specifically at Plaintiff. First would have been Andrepont's report that Plaintiff herself disclosed inappropriate sexual comments made to her by Martinez. Second would have been Hagler's report, made shortly

---

[5] In his declaration, Andrepont initially indicated that he had Plaintiff prepare a written report detailing her allegations that he then forwarded to Principal Collins, *see* ECF No. [58-13] at ¶ 4, but at his deposition, Andrepont testified that he did not have Plaintiff provide a written report, *see* ECF No. [52-1] at Exh. N at 30-32.

after the alleged sexual encounter on April 17, 2012, of a rumor told to him by a student that Plaintiff and Martinez were involved in a relationship. Third would have been Martinez's report, also made shortly after the alleged sexual encounter on April 17, 2012, of a rumor told to him by a student (a different student than the one that spoke with Hagler) that Martinez had "hooked with a student."

Of course, those three reports must also be viewed in light of both Plaintiff and Martinez's denial to Hauptner and Principal Collins of any inappropriate relationship between them. However, given that the three reports to the contrary amount to "a series of related allegations" and arguably suggest the possibility of "a pattern of sexual harassment[,]" *Sch. Bd. of Broward Cty.*, 604 F.3d at 1259, the Court does not take the view offered by G-Star School that such denials—particularly Plaintiff's—affirmatively establish that Hauptner and Principal Collins could not possibly have had the requisite actual notice. Such a determination, in the Court's view, ought to be left for a jury to decide. *See, e.g.*, *Doe A v. Green*, 298 F. Supp. 2d 1025, 1034 (D. Nev. 2004) (finding that a reasonable jury could conclude that actual notice of sexual harassment was established despite the plaintiff's denials about a relationship with the teacher involved and reasoning that "[w]hile the complaints may be unsubstantiated by corroborating evidence and denied by the allegedly offending teacher, whether such complaints put the school district on notice of a substantial risk to students posed by a teacher is usually a question for the jury") (citation omitted). As the court in *Green* and other courts have noted, "a complaint of harassment need not be undisputed . . . before it can be considered to fairly alert the school district of the potential for sexual harassment." *Id.* at 1034 (citing *Gordon v. Ottumwa Cmty. Sch. Dist.*, 115 F. Supp. 2d 1077, 1082 (S.D. Iowa 2000); *see also Gordon*, 115 F. Supp. 2d at 1082 (explaining that the actual notice standard "does not set the bar so high that a school

district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student. At some point . . . a supervisory school official knows . . . that a school employee is a substantial risk to sexually abuse children"). Accordingly, the Court is satisfied that Plaintiff has met her burden of raising a material issue of fact on the issue of actual notice.

### B. Deliberate Indifference

In addition to requiring that an appropriate person have actual notice of the teacher's misconduct, a Title IX plaintiff must show that the school official was deliberately indifferent to that misconduct. *Gebser*, 524 U.S. at 277. "Deliberate indifference is an exacting standard; school administrators will only be deemed deliberately indifferent if their 'response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Sch. Bd. of Broward Cty.*, 604 F.3d at 1259 (quoting *Davis*, 526 U.S. at 648). "In essence, Title IX's premise 'is an official decision by the recipient not to remedy the violation.'" *Id.* (quoting *Gebser*, 524 U.S. at 290).

"Deliberate indifference" is more than a "mere reasonableness standard that transforms every school disciplinary decision into a jury question," *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999), and "describes a state of mind more blameworthy than negligence[,]" *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "'Deliberate indifference will often be a fact-laden question,' for which bright lines are ill-suited." *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 398 (E.D.N.Y. 2005) (quoting *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 457 n. 12 (5th Cir.1994)); *see also Green*, 298 F. Supp. 2d at 1035-36 n. 4 (stating that no bright line rule in Ninth Circuit cases defines "deliberate indifference," and from review of cases outside the Ninth Circuit, "it is clear that most courts have similarly not discovered such a bright-line"). That said, where an educational institution "takes timely and reasonable

measures to end the harassment," it is not deliberately indifferent. *See Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999). Moreover, the measures do not have to ultimately prove effective in preventing subsequent misconduct, so long as they were taken in good faith. *See Sauls v. Pierce County Sch. Dist.*, 399 F.3d 1279, 1285 (11th Cir. 2005) (citing *Taylor Indep. Sch. Dist.*, 15 F.3d at 456 n. 12). As an example, a principal receiving reports of possible teacher-to-student sexual harassment does not act with deliberate indifference where he or she promptly investigates the matter and, following that investigation, institutes corrective measures and continues to monitor the situation. *See id.* However, a Title IX entity's response must be more than "minimalist," V*ance v. Spencer County Public Sch. Dist.*, 231 F.3d 253, 260 (6th Cir.2000), and where an educational institution "either fails to act, or acts in a way which could not have reasonably been expected to remedy the violation, then the institution is liable for what amounts to an official decision not to end discrimination." *Green*, 298 F. Supp. 2d at 1035.

Here, the investigation Hauptner and Principal Collins initiated upon becoming informed of the rumors that Plaintiff and Martinez were involved in a relationship and that Martinez had "hooked with a student" was undeniably prompt and certainly conclusive. That investigation involved meeting with Plaintiff immediately, during which time Plaintiff denied any involvement with Martinez and signed a memorialized statement to that effect. As G-Star School describes, Plaintiff chose "not to volunteer any information" and also "chose to vehemently discredit the rumor. . . ." ECF No. [52] at 15. Following that meeting, the investigation continued, as Hauptner and Principal Collins spoke with Martinez, who also denied any inappropriate involvement with Plaintiff. Before coming to the ultimate conclusion that there was "a complete lack of any evidence that the rumor is true" and deeming "[t]he matter concerning the teacher [as] dropped" accordingly, ECF No. [52-1] at Exh. K, Hauptner and Principal Collins had

Martinez and other teachers with classrooms in the same building as Martinez detail their schedules during the week of the alleged sexual encounter. Those efforts confirmed that Plaintiff did stay late in Martinez's classroom on April 17, 2012 in order to make up a test. As reflected in Hauptner and Principal Collin's final report, those efforts also confirmed that two other students were in the classroom when that test was administered—a detail that appears to have been influential in Hauptner and Principal Collin's final conclusion. *See id.* ("There is a complete lack of any evidence that the rumor is true that [Plaintiff] and the teacher had any inappropriate contact. . . . The test was administered and made up that day while two other students were in the room. There was no inappropriate contact between the teacher and [Plaintiff].").[6]

Notwithstanding the above, the Court is far from convinced that there exists no genuine issue whatsoever as to whether Hauptner and Principal Collin's response was unreasonable in light of the known circumstances. First and foremost, as is the case with the issue of actual notice, the circumstances that were known to Hauptner and Principal Collin and the response relative to that knowlege are not without dispute. As discussed, there is conflicting evidence as to whether Hauptner and Principal Collins ever received a report from Andrepont concerning Plaintiff and Martinez prior to the alleged sexual encounter on April 17, 2012 and the ensuing investigation. G-Star School's position, consistent with Hauptner and Principal Collin's testimony, is that no such report was ever made, and so naturally the record is without any evidence or representations that G-Star School undertook any remedial efforts prior to the alleged sexual encounter. If such a report was made, as Plaintiff and Andrepont have testified to, than that report would undoubtedly inform the inquiry as to the reasonableness of Hauptner and

---

[6] The Court notes, however, that according to Martinez's report, the two other students were only in the classroom for "10 mins" beginning at "3: pm approx[,]" whereas Plaintiff's presence in the classroom is documented as follows: "make up Homework 30 mins 3:30 pm approx." ECF No. [58-18].

Principal Collin's investigation. *See Sch. Bd. of Broward Cty.*, 604 F.3d at 1260-61 ("If we were examining the School Board's response to the K.F. incident alone, it is unlikely that this investigation, though imperfect, could be viewed as 'clearly unreasonable in light of the known circumstances.' . . . However, the 'known circumstances' from which we evaluate the reasonableness of a School Board's response changed significantly once S.W. filed her complaint. . . . Once Scavella had actual notice of a second complaint, his failure to institute any corrective measures aimed at ferreting out the possibility of Hoever's sexual harassment of his students could constitute deliberate indifference."). This in and of itself presents a genuine issue of fact precluding summary judgment on the issue of deliberate indifference.

In a similar vein, another conflict in the evidence bears noting. Hauptner and Principal Collin's April 23, 2012 note indicates that they had spoken with Plaintiff's parents regarding "rumors concerning their daughter and [] ask[ing] [Plaintiff] about any inappropriate activity between her, any teacher, any staff member or students." ECF No. [52-1] at Exh. H. But that note is at odds with what Plaintiff's parents testified to at their respective depositions. *See* ECF No. [58-7] at 3-4 ("Q. Okay. Is it your testimony that Mr. Hauptner and Mrs. Collins never asked you whether [Plaintiff] had ever said anything to you about an inappropriate relationship with a teacher? A. No. . . . They were never – I was never made aware of anything to that extent."); ECF No. [58-8] at 3 ("Q. Did they tell you that they had been hearing any rumors concerning your daughter of any inappropriate activity between her, any teacher, any staff member or any student? A. Absolutely not."). This dispute is certainly material to the inquiry into the reasonableness of Hauptner and Principal Collin's investigation. As reflected on the April 23, 2012 note, part of that investigation purportedly involved Hauptner and Principal Collins enlisting the assistance of Plaintiff's parents. *See* ECF No. [52-1] at Exh. H ("We asked her

parents to talk to [Plaintiff] at home to determine if there is anything she may not be telling us. . . . We asked them to call us immediately if [Plaintiff] gave them any more information about the rumors.").

Furthermore, the Court finds that there are aspects of Hauptner and Principal Collins' investigation—primarily in the form of certain inactions—that support the conclusion that there is a triable issue as to whether Hauptner and Principal Collins were deliberately indifferent toward Plaintiff, especially when considered in light of the above mentioned disputes. Looking only at the alleged sexual encounter for a moment, this is not a case where the victim him or herself directly reports a sexual assault to school officials. Rather, this is a case where, allegedly, the victim was involved in an ongoing inappropriate relationship with the assaulting teacher when the sexual assault occurred and, importantly, where school officials were notified as to the possibility of such not by the victim, but by reports attributable to other students in the school. G-Star School recognizes as much. *See* ECF No. [63] at 6 ("The subsequent steps that G-Star took in investigating the rumor were guided by Plaintiff's statement that *the rumor was created by other girls* at G-Star—this was the known circumstances.") (emphasis added). Those students were Nordarse, who spoke with Hagler, and Elkins, who spoke with Martinez—information of which Hauptner and Principal Collins were aware. It should not be overlooked that had neither Nordarse nor Elkins ever come forward with their reports—whatever their intentions may have been—it is quite possible that no school official at G-Star School would have been alerted to the possibility of a sexual assault having occurred in Martinez's classroom on April 17, 2012. Recognizing such, a reasonable jury might believe it necessary for an investigation under these circumstances to include interviews with the students who actually reported the rumors in the first place. Here, however, Hauptner and Principal Collins interviewed neither Nordarse nor

Elkins. *Cf. Davis v. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1373-75 (11th Cir. 2000) (finding no deliberate indifference in high school principal's investigation of a complaint that a teacher inappropriately touched a student and tried to touch her again shortly afterwards where that investigation involved "interviewing the alleged victim and other students").

The decision not to interview Nordarse is particularly compelling, as her report to Hagler was based on communications she had with Plaintiff personally. It is not out of the realm of possibility that a minor student might tell a classmate one thing but a school official just the opposite upon confrontation, especially where the thing being told is potentially of a sexual nature. *See Davis*, 451 F.3d at 763 (explaining that a court is to draw all reasonable inferences in the non-moving party's favor). Nordarse could have shed light on the circumstances surrounding Plaintiff's hinting to her that she was in a relationship with Martinez. Relatedly, although Plaintiff's denial of the subject matter of the rumors are well-documented throughout Hauptner and Principal Collins' notes, there is no indication that Plaintiff was ever asked if she in fact hinted or stated to Nordarse that she was involved in a relationship with Martinez—as Nordarse reported to Hagler. A reasonable jury might think this a critical omission, because had Hauptner and Principal Collins confirmed that Plaintiff herself had at one point stated to a fellow student that which she was denying to them, they may have looked at her "vehement[]" denials, ECF No. [52] at 15, through a more skeptical lens, which in turn may have influenced their investigative methods.

Other relevant inactions include Hauptner and Principal Collin's "failure to institute any corrective measures aimed at ferreting out the *possibility* of [Martinez's] sexual harassment of [Plaintiff or] his students . . . ." *Sch. Bd. of Broward Cty.*, 604 F.3d at 1261 (emphasis added). For example, there is no evidence that Hauptner and Principal Collins made arrangements to

minimize in-school contact between Plaintiff and Martinez or even advised Martinez regarding future interactions with Plaintiff, or other female students for that matter. *Cf. Davis*, 233 F.3d at 1373-74 (finding determinative the high school principal's corrective measures, which included removing an alleged student victim who had previously complained of inappropriate contact with a teacher from the teacher's class and directing the teacher to avoid out-of-class contact with the alleged victim and being alone with any female students). To the contrary, Plaintiff was enrolled in Martinez's psychology class her junior year. Pl. Additional Facts at ¶ 26. Additionally, though Hauptner and Principal Collins found reason to continue to monitor the situation involving the potential bullying of Plaintiff by four of her fellow students, *see* ECF No. [52-1] at Exh. K, they apparently found no reason to continue to monitor the situation involving Plaintiff and Martinez, such as by following up with Plaintiff or taking efforts to monitor Martinez's behavior, *cf. Davis*, 233 F.3d at 1374 (observing that the principal followed up with the alleged victim several times and monitored the teacher at issue); *Sauls*, 399 F.3d at 1285-87 (analogizing the defendant school district's investigation to the investigation in *Davis* and noting that "[s]chool officials also consistently monitored [the teacher's] conduct[,] [] warned her about her interactions with students[,]" and also questioned the student involved—who had denied any relationship between him and the teacher—about his purpose and destination whenever he was seen near the teacher's classroom). Finally, Hauptner and Principal Collins did not contact either the police or the Florida Department of Children and Families at any point during their investigation. Pl. Additional Facts at ¶ 25; *cf. Sauls*, 399 F.3d at 1286-87 (noting that the superintendent, upon receiving an anonymous phone call alleging that the student's and teacher's cars had been seen parked in the woods, contacted the Professional Standards Commission and

requested that it investigate the teacher, and notified both the county Board of Education and the local police department).

Overall, in light of all of these facts and the disputed issues identified, the Court finds that there is certainly a triable issue as to whether Hauptner and Principal Collins acted with deliberate indifference to Martinez's alleged misconduct toward Plaintiff.

## IV. CONCLUSION

For all of the reasons stated herein, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment, **ECF No. [52]**, is **DENIED**.

**DONE AND ORDERED** in Miami, Florida this 16th day of May, 2017.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record